Good morning. We will hear argument in the almost 13-year-old case with Engers versus AT&T. Mr. Bruce. Thank you, Your Honor. My name is Stephen Bruce, and I represent the plaintiff's appellants in this case, and I want to reserve three minutes for rebuttal. Granted. Your Honor, after notice in this case was finally issued when the age discrimination claims were reinstated after the City of Jackson case, remarkable 23,900-plus current and former AT&T employees joined in this action individually as plaintiffs. This is the largest collective action that we've been able to find out in U.S. history. AT&T's transition to a cash balance pension formula was designed in a way which cost tens of thousands of these people a substantial part of the retirement income that they might reasonably expect from working for AT&T. Well, not at final retirement age. Yes, at final retirement age. We've provided papers illustrating how Jerry Smith, who originated this case, had earned, these are papers prepared by AT&T, which show that he had earned $1,985 per month as of January 1st of 1997. After he worked for AT&T for eight more years, AT&T sent him papers showing that he was entitled to the exact same amount of $1,985. You said at final retirement age? He was at age 55. I'm talking about final retirement age. That was when he lost his job, Your Honor, was at age 54, close to age 55. There are hardly any AT&T employees who make it to age 65 as AT&T employees. Most of the reductions which occurred shortly after this cash balance conversion as a result of a retirement incentive program were people in their late 40s and early 50s. Within the context of AT&T, those were the older AT&T employees, and those were the employees that AT&T encouraged out the door by establishing a transition where they would be looking at no additional retirement benefits for a period of years. But Judge Roth's question dealt with those who retire at age 65, and those who retire at age 65 had greater benefits under the new plan than they did under the old plan. Is that correct? That's 1% of the people who retire at age 65, Your Honor. The answer is yes or no. If they worked to age 65, they did have greater benefits, correct? For those 1% of the people, that's correct. Yes, you're saying. During this eight years of employment that Mr. Smith had between 1997 and 2004, he earned cash balance credits which totaled over $64,000. This is starting from zero. He earned cash balance credits totaling $64,000. This is before the change? No, after the change. He earned $64,000 in credits, which translated to an age 65 benefit would be $800, and translated to an age 55 benefit would be $450. As a result of this wear-away provision, he receives none of those benefits. He does not receive the $450 based on his age 55 retirement, and when he reaches age 65, he will not receive the $800. In 1997, could not AT&T have terminated early retirement subsidies entirely? They are required by law to protect. The vested ones. To protect the early retirement benefits and for people who have not achieved eligibility to allow them to grow into eligibility. And so Mr. Smith was entitled to the $1,985 as of January 1st of 1997. If he left AT&T as of that date, he would have received that full amount. It was not conditional on him continuing to work. It was conditional on him reaching age 55, but not as an AT&T employee. So as of January 1st of 1997, he has earned this amount of money. And the question is, what does he earn for those additional years of service? And in terms of age discrimination, you cannot excuse age discrimination in the current and future period based on what you've done for people in the past. You can, you know, as an employer, I can call myself very generous, but if I pay discriminatory wages or benefits in the current period, I cannot reach back into the past and say, well, this should be excused because I have a storehouse of credits against age discrimination. Let's leave Mr. Smith for a moment. Now, you conceded, did you not, that your ADEA claims pertain to benefit accrual? Our ADEA claims pertain to both benefit accrual and benefit payment. And the focus is on benefit payment. The outputs? The outputs in terms of register, I think, would be the benefit payments. And so the focus of our claims is that people, Mr. Smith got these credits, but he does not receive any payments. You're saying the district court was wrong in saying that your claim was only as to the accrual? I think the district court was accurate that it... He said you conceded it. No, he said that we conceded that the claim related to accruals. He didn't say that... Related to benefit accruals. He didn't say that we conceded that that was all it related to. Well... That the claim relates... I mean, and the focus of the claim is on benefit payments, Your Honor. And the... And I think that's... Protection under ERISA is on accruals. Is on accruals only, isn't it? According to the register case. Yeah, according to register, which binds us. It doesn't bind you in terms of the Age Discrimination Act. Because the Age Discrimination Act provides for the broad protection of employees against discrimination and compensation, and specifically employee benefits, as a result of the Betts decision in 1990 changes to the Age Discrimination Act. Regarding Rule... Rather, Section 4I, I mean, you mentioned but don't dwell on probably, obviously, the Herlick and Jensen cases, but there's two other circuits. Aren't you asking us to create a circuit split? I don't think that it would be a circuit split with Herlick at all. Because Herlick doesn't involve the Age Discrimination Act. It involves a state law counterpart to it, which did not even have Section 4I in it. So the Jensen case, I believe, this Court's decision would be inconsistent with. But the Jensen decision is plainly wrong on that issue. The Jensen decision is a case that I did. So I'm very familiar with it. And the logical... I don't know whether the 10th Circuit would agree with you, but okay. Well, the logical flaw, Your Honor, which the District Court here originally recognized, is that the Section 4I-4 provides that compliance with Section 4I shall constitute compliance with the requirements of this section relating to benefit accrual. And as the District Court originally said, that language suggests that there are other requirements relating to other things, such as payment. So that if compliance with Section 4I established compliance with all of the ADA, there would be no reason for the words relating to benefit accrual, because that's a limiting phrase. And so... What case stands for that proposition as opposed to it being game, set, and match once there's been compliance with Section 4A-I? Well, there are District Court cases which we cited, the Vaughn and the Duke Power case. And originally, the District Court in this case agreed with that. Originally, the District Court said that compliance with the requirements relating to benefit accrual was not the full extent of the Age Discrimination Act. And if you look at the purposes of the Age Discrimination Act, it makes no sense that bookkeeping credits for Mr. Smith would constitute compliance with the Age Discrimination Act when the economic substance is that he is earning no additional benefits for those eight years. Your yellow light is on. I want to lead you into another area. Your improper retroactive plan amendment argument, as to which Judge Chesler said it was a novel theory, correct? Right. Did not Judge Chesler say it was a novel theory, but yet go on to decide it on the merits? No. He had before him the committee's decision, and he said he was reviewing it under an abuse of discretion standard. No, Your Honor. He did not, in at least my reading of the decision, he did not go anywhere beyond the conclusion that this was an entirely new legal theory. Well, he says at page JA15 that you bear the burden of proof at trial on the fourth and fifth claim and may meet, your defendants may meet their burden by pointing to the absence of evidence to support plaintiff's case. Defendants have done so, the burden shifts to plaintiff to support their case with evidence and have failed to do so in a granted summary judgment. It was my assessment, because I know in your blue brief, you never mentioned the committee, period. It was my assessment that Judge Chesler simply found novel theory and dropped it. But he did go further than that, didn't he? I don't read that that way. What I read, I mean, and he did, he had a similar analysis in another part of the decision that what I think he's saying is that this was an entirely new legal theory that the amendments were not timely and properly adopted. Therefore, I'm looking, is there anything, is there any other theory that was in the he's adding this language, but he's not, the theory that we always prosecuted was that this was not timely amended. I don't disagree with you. Yes. Yeah, I think he probably was wrong when he said this was a novel theory and I will ask your friend across the aisle about it when his time comes. But even if it were, I'm just suggesting he seemed to go further. He didn't just drop it. I think what he's saying is that putting that aside, I don't see them raising any other problem with this. Well, what is he, let's assume we sent it back on that. What you've got, what he has before him is the committee decision reviewable on an abusive discretion standard, correct? What would you have submitted or what would you submit to say that the committee abused its discretion? We don't believe. When it's found against you on this improper amendment. We don't believe it is an abusive discretion standard. But why? Because it's a statutory issue under the Schooner-Jongen case and under Deppenbrock in this circuit. Schooner-Jongen, not Schooner-Jongen. Yes. It's a Dutch C-H-E. I'm sorry. But under both those cases, it's a statutory issue, which gets de novo review by both the The committee is not entitled to any deference at all? No. I think that what judge, the reason why we didn't appeal the sending it back to that committee was because we understood that this court would view that for abusive discretion and that the district court always has. It went to the committee because Judge Linares found in 2006 you had to exhaust your remedies, right? Right. And that was how you exhausted your remedies, by going before the committee. And then comes summary judgment time, and there were cross-motions for summary judgment on this issue. And Judge Tessler found that it was a novel theory, but he also found that you had not submitted any evidence to support, you know, in opposition to their motion. And they had submitted evidence saying that they did not abuse the discretion. So I'm just asking you, if we were to send it back, what would you argue? What would you argue to Judge Tessler to say that the committee abused its discretion? Or even that it was wrong on a de novo standard of review? Well, that there was not a timely amendment. All you have to do is to compare the board resolutions in 1997 with the plan document in 2000. There are conditions on the benefits involving the wear-away and the benefit options that were not in the board resolutions. And we had deposition testimony from their 30B6 witness and the senior vice president who made the presentation to the board of directors that our position was correct. We had draft documents showing that these provisions were changed six months before the filing. Let me ask you another question. Even if your position were correct, we're getting, you know, even if, even if, even if, even if, how many plaintiffs could potentially benefit if Judge Tessler were to agree with you on your argument? Judge Lenara suggested, quoting from your brief before him, that AT&T would have to recalculate the benefits of any participant who chose the cash payment option between 1997 and 2000 if that was, and then find if that was the participant's highest benefit. Judge Lenara speculated that it seems that this would alter in some cases, and in some cases increase the amount of benefits due to certain plaintiffs. How many, how many plaintiffs are you, you talk about a class of 24,000, how many plaintiffs would, would come within this, this apparently narrow range here? Of those, no, it's a three-year period. Yeah, right. That's a very substantial part of the class. And in terms of the wear-away provision, the wear-away- Were they retired with a cash benefit? Yes, almost. That people were taking the cash payments right and left without being informed that it was a less valuable option and that these rules had been created in between the board and the, they were being basically, they were being applied without authority. There had been no adoption of the rules that AT&T was actually applying so that they, when they were giving them this cash payment option, which was to, up to one year's pay plus $30,000 and then the rest of it was supposed to be as an annuity, that AT&T was not basing that on the annuity that people already had, which was more valuable. They were basing it on this cash balance option, which had been devalued so that people were, were electing out of several hundred dollars. And we had examples of Dolly Dobbins, who lost about $250 a month from that issue alone. Ed O'Brien, who lost close to $200. Let me ask you a further question. If, if, if, if, another if, if we should agree with you on the amendment issue, that it can be addressed on the merits rather than simply thrown out, can we decide that issue or do we have to remand it to the district court? We, we only asked you to remand it to the district court, but with instructions for the district court to consider our motion for summary judgment that we had cross moved and the district court said that our motion was moot because this was, so it never really even addressed our motion. So you never really had a chance to present? Right. Okay. Thank you. We'll get you in rebuttal. Mr. Carpenter. I'm David Carpenter for the defendants. Mr. Carpenter, before you begin, let me just ask you this question before I lose the thought with reference to the last couple of statements that your friend made, with reference to this entirely new legal theory that Judge Chesler found. If that is correct, what did Judge Linares mean when he said in 2006 that quote, plaintiffs argued that the resolutions adopted by the board in April 97 are substantively different than two amendments later approved in October 16, 2000. And thus the resolutions constitute an informal amendment in violation of ERISA end quote. The fundamental issue here is what the meaning of the 1997 resolution is. We say the 1997 resolution adopted what they refer to as the wear away provisions. And it also had a provision relating to the form of benefits for the so-called special update. They say that we're wrong, that the 1997 amendment didn't mean that, and that those particular provisions weren't adopted until 2000. So the fundamental issue here is an issue of plan interpretation. What did the 1997 board amendment mean? And that's why this was referred to the benefits committee, because under your decision in Harrow, if it's an issue of plan interpretation, then you require exhaustion of the administrative remedy, which meant it had to go to the benefits committee first. Now he says he's making an argument about interpretation of ERISA. If that's the argument he's making, that's an entirely new argument, because this never would have been sent to the benefits committee if he was making a claim involving the interpretation of ERISA, rather than an interpretation of the plan. Judge Linares found it was a claim for benefits under 502. Yes, it's a claim for benefits, because if their interpretation of the 97 resolution were right, then AGT wasn't awarding high enough benefits to people who retired before 2000, because it would have meant that you would have had to add something to this special update that it wouldn't have been frozen. Were there tens of thousands of people who fit into that category? I don't know the answer to that. I don't know. It's not a moot issue, that's for sure. Can I ask you, what do we do? We have a benefit committee decision. Is that entitled to deference? Oh, of course. Under the Supreme Court decisions, under your decisions. And his argument that it's not entitled to deference rests on the false premise that his claim doesn't involve interpretation of the plan. Of course it does. His argument is that the, his argument assumes a valid 1997 interpretation. His argument is they shouldn't get the frozen special update. They should get the frozen special update plus an additional amount. What did Judge Fessler decide, if anything, besides the fact that this was a novel theory? Which I personally- Decided that we made a prima facie showing under Rule 56-F, and that they provided no opposition, because the only claim they'd made was this new claim. Is that a finding on the merits? Yes, it's a finding on the merits, that they had no opposition other than this new claim. It means they had no opposition to our abuse of discretion. Well, if the claim's not new, if we find the claim's not new, what then? The only way you can find this claim is not new is if you characterize this claim as a different way of expressing his plan interpretation claim. Because if he was arguing that this plan, that there was a violation of 502-A, that would mean that we didn't follow the plan's procedures when the amendment was made in 1997. That would mean the entire amendment is invalid, including the special update. They like the special update. What they're arguing is that the plan, as adopted in 97, has to be interpreted so they don't get only the special update, but they get extra amounts above and beyond the special update. So the only way you can find that this is not a new theory is if you find it's just another way of expressing the issue of plan interpretation that went to the Benefits Committee. We demonstrated before Judge Chesler that that was not an abuse of discretion, and Judge Chesler said they hadn't opposed that. And you don't have to worry about what they said before Judge Chesler, because the only argument they've made on appeal is that their 402-A claim wasn't new, and they didn't argue that they'd made any arguments in their opening brief about whether the Benefit Committee decision was an abuse of discretion. In fact, as you point out, their opening brief didn't even mention the Benefits Committee decision. And this claim, the claims they've made are, if you send this back, this is just a formal exercise. Their claim is that they made two claims about the special, three claims. First, they said the special update is not really frozen. You've got to add the special update and the cash balance amount to get the final benefit. Now, the initial cash balance and the special update both include service for the period prior to 1997. So the Benefits Committee rejected that claim on the ground, quote, that would have entitled participants to double credit for service prior to January 1st, 1997. And that's JA-4953. And this claim is so absurd that plaintiffs now deny they ever made it. And that's smart, because that claim is just absurd. So the claim they now make is that the special update really wasn't frozen, but you have to add the annual service credits to the special update. But that claim has absolutely no support in the resolution, because the resolution says the special update is a one-time frozen benefit and that the cash balance, it's the cash balance account where you get the accruals. And the Benefits Committee said about that is, quote, the cash balance formula is the only formula under the plan that provides for ongoing accrual. That's also JA-4953. The final claim they raised is whether you can get something called a joint and 100% survivor form of benefit under the special update. And the Benefits Committee rejected that, because the plan provides that that's a benefit under the cash balance account formula, not under the special update. That's JA-495456. So all these claims, I mean, we were right when we said that there was no abuse of discretion. I don't know how the plan could be interpreted any differently, but Chesler ruled for us on the merits on that, and they didn't appeal that. The only argument they made was this argument about whether the 402B claim was a new claim. And if it's a new, and if it's not a new claim, it's only because it's a different way of articulating the claim they made before, which was a claim of plan interpretation for all the reasons that I just said. Your time's running. Can you address the ADEA issue? Yes. He conceded today that their claim relates to benefit accrual, and it clearly does. This is a challenge to the benefit accrual provisions of this plan. You have the special update that's frozen. You have the cash balance plan where you accrue annual credits. And their argument is that those provisions are unlawful and that you have to accrue annual credits on top of the special update. So they're seeking to modify, essentially, the benefit accrual provisions of the plan. So it clearly relates to benefit accrual, and they conceded that today. And under the terms of the statute, if it relates to benefit accrual, then it satisfies all the requirements of Section 4, if it complies with the requirement of 4A, 4I4, that the rate of benefit accrual not cease or be reduced on account of age. And that's, I think- And you like Herlick and Jensen. Yes. And Herlick, he's correct that that was a case brought under state ADEA. But under the federal law, state ADEA claims are preempted if they couldn't be brought under the federal ADEA. And the Ninth Circuit held that it couldn't be brought in the federal ADEA because of 4I. So it's quite clear that wear away claims are barred by 4I, when, as here, there's no differentiation in the rate of benefit accrual based on age. Here you have a result of two different- the interplay of two different benefit accrual provisions that are non-discriminatory. Well, the frozen- the special estate's frozen for everyone. It's a one-time benefit for everyone. And then the cash balance formula actually benefits older people because the initial cash balance is bigger if you're older. And the rate of the annual credits is bigger if you're older. So- Older or longer term of service? Older. Older. Which is implicit. Is it true that only 1% of AT&T employees wait until they're 65 to retire? That probably was true under the old plan, which had these generous early retirement subsidies. And one of the things AT&T had a right to do was eliminate early retirement subsidies. And the answer to the question one of you asked, it could have done that. And that would have meant that anyone who'd not yet qualified for early retirement wouldn't have gotten early retirement subsidies. And what AT&T did, you know, maybe in a mistake that led to, in an act that led to a lot of litigation, is that it adopted measures to protect people who were within seven to eight years of early retirement eligibility. And that's what gives rise to this wear-away problem that they're objecting to. Those people did very well under the new plan, correct? Those who were closer to retirement. Yes, because of the special update, they did better. And the irony of this age claim is that they're complaining about something that makes the older worker better off than the younger worker. The younger worker just gets... Of those people who were closer to retirement. And then the benefits tend to increase less. Right, right. But this does it by freezing this special update. It means that during this wear-away period, unlike the younger workers who've crossed over, the older workers get not only the actuarial equivalent of their age 65 benefit, but they get something extra. And that something extra diminishes a little bit each year. And what they want is that special update to keep accruing the full credits of the cash balance so the early retirement subsidy becomes permanent. That's the claim. I keep thinking of my father's words, work is its own reward. Just keep working, no matter how old you get. He didn't talk about his disclosure claims. I wouldn't blame that on him. We've kept him very busy with a couple of other claims. I just want to make one point about this claim that we were intentionally or actively concealing the fact that our plan was going to result in wear-away. Twelve days after these amendments were adopted, April 28th, we issued a letter, sent a letter to all employees saying that if you're within seven years of early retirement eligibility, generally your benefit is going to be calculated under the frozen special update and not the cash balance. Twelve days. In August, we sent out a notice about the special update. And then in November, we sent out a booklet about the cash balance plan that towards the end talked about wear-away and gave two examples of people who are in wear-away. Now their claim that we concealed wear-away is based on minutes of a meeting of the people who were preparing that November booklet. And what they were discussing in these minutes, this is their smoking gun, is where in this booklet wear-away would be discussed. They said we shouldn't have it in the first four pages. We'll have it later in this 30-page booklet. Also in this 30-page booklet, we reminded people that we'd set up an intranet site that they could access from their ATT computers where they could go and calculate what their wear-away period would be, what the crossover point would be. And people, including the named plaintiffs, went to that site and calculated their wear-away amount. The named plaintiff, Smith, went to this website on November 12th and calculated that his wear-away period would be eight years. That's JA-774. And he filed the EEOC complaint that led to this lawsuit on January 15th. And that's before he received the summary plan description that they say is inadequate. But it's not inadequate because the summary plan description too says that there may be instances in which the frozen special update will exceed the cash balance amount. So we disclosed wear-away beginning right after the adoption of the plan and throughout the subsequent period. In fact, the most frequently asked question about the plan as of August 15th had to do with wear-away. That's JA-825. Another claim they make is a fiduciary duty claim. Let me ask you, sir, on the amendment and the improper amendment, the new theory. If we decide we won't consider it under the new theory, we'll consider the claim on the merits. Can we do that ourselves or do we have to remand this case to the district court? Absolutely, you can do it yourself because we made the showing that there was no abuse of discretion. The district court found our showing sufficient, said they had no opposition to it. And for the reasons I said before, this is a no-brainer. I mean, the provisions of the resolution are perfectly clear. When I read ERISA, I feel like I'm a no-brainer and the others are worse. Can you imagine some man or woman from Mars listening to this argument? I agree that ERISA is not a model of clarity, but no one, I don't think, could reasonably have thought that the special update was not frozen and that's their argument. We said over and over and over again, the resolution said it, everything we said in our communications to employees said, this is frozen, there may be instances in which your frozen benefit, the special update, will exceed the cash balance benefit and the cash balance benefit is the only benefit that grows and their claim is that the special update should grow. So I see my time is up. So, thank you. Thank you, Mr. Carpenter. Rebuttal? A couple of things. Mr., when we took depositions of the two former CEOs of C. Michael Armstrong and Robert Allen, who was the CEO at the time of this cash balance conversion, neither one of them understood the wear-away. Mr. Allen testified that he did not know what wear-away was, even though he sat on the Board of Directors and was chairman of the Board of Directors during that time period. Mr. Armstrong is displayed in town meetings with the employees, was under the impression that if people got beyond the crossover period, that all was made whole. And that is reflected in part of what Mr. Carpenter says today, that somehow during this period of wear-away that people are still getting value from somewhere. But there is no value. Mr. Smith had $1,985 as of January 1st, 1997. If he walked out the door, he had that $1,985 without reservation. All he got in the eight years since that time were bookkeeping entries. And if we're at a point where bookkeeping entries can establish compliance with the Age Discrimination Act, where it does not have to reflect any reality in terms of people receiving payments, then I think that, you know, we're certainly at a point where Congress will do something again. They've already stepped in and prohibited these wear-away periods whether or not anybody proves that they were age discriminatory. They prohibit them from whether or not there was adequate disclosure. This was a pernicious practice, and it was directed at the older employees. We discovered spreadsheets, which we have in Exhibits 111 through 150, is a series of spreadsheets where AT&T was calculating the periods of wear-away that the older employees would have. They did line graphs to show that. All this was internal. And they had PowerPoint presentations to the executives who were making these decisions, specifically stating that younger employees, quote, will earn benefits immediately. Other employees will take three-day years. Those other employees were the ones that they wanted to leave AT&T, and droves of them did in 1997 and 1998 as they were facing no additional benefits. We, Mr. Armstrong, was asked at a town meeting, where's the retention incentive for a 50-year-old employee in terms of the pension benefits? But if we decide that what is done complies with the statute, the fact that you think something else should have been done really is of not great significance, right? If you decide that bookkeeping entries are all that's required to satisfy the Age Discrimination Act or ERISA, the idea that the anti-backloading rules only protect bookkeeping entries and that people do not have to receive payments, even though the statute says payable, over and over again, it's, you know, that these reform-minded statutes are being subverted by bookkeeping analysis and manipulation of numbers where on the 204H claim, they want to manipulate when the benefit reductions were effective. They want to go back to an earlier point in time where they can group increases with the reductions so that people aren't told that as of 1998, you are not earning benefits at the same rate as you were before. Their own spreadsheets show that. Their own actuarial experts made calculations showing that. They still deny it today. They still deny to their employees that the cash balance conversion was designed to reduce people's benefits. I thought you, I just heard you say something that I thought you agreed with me earlier. That under the new plan, age 65 benefits are higher when you retire at age 65 than they were under the prior plan. If someone like Mr. Smith, if he did not start his retirement benefits at age 55 but waited till age 65, he would be giving up value. There is no way that unless a person was still working for AT&T. That's what I'm saying. There's no economically rational reason. Somebody who left at 65 would be doing, would do better under the new, under the amended plan than they would have under the prior plan, right? Right. Somebody who continued to work till age 65 but somebody who left, lost their job at age 55 as most of these employees did. If they waited till age 65 to start drawing those benefits, they would be giving up economic value. There's no economically rational reason why they would do that. Thank you. Well, the case was extraordinarily well argued. Obviously, we're going to take it under advisement. The panel would like to have a transcript of the argument. Can you work together and see that that is done? Yes. Appreciate it. Thank you very much. Thank you.